# EXHIBIT A

# Commonwealth of Massachusetts

SUFFOLK, ss.

SUPERIOR COURT DEPARTMENT
OF THE TRIAL COURT
CIVIL ACTION



HERBERT A. SARKISIAN, JR.,
Individually and Derivatively on Behalf of
MOORS & CABOT, INC.

No. 06-0887 BLS

RECEIVED

MAR 01 2006

SUPERIOR COURT · CIVIL
MICHAEL JOSEPH DONOVAN
CLERK / MAGISTRATE

v.

ROBERT W. MOREY

## SUMMONS

To the above-named Defendant:

    You are hereby summoned and required to serve upon   R. Robert Popeo, Michael S. Gardener and Meredith M. Leary, Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C., One Financial Center, Boston, MA 02111 plaintiff's attorney, whose address is ___(above)___ , an answer to the complaint which is herewith served upon you, within 20 days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. You are also required to file your answer to the complaint in the office of the Clerk of this court at Boston either before service upon plaintiff's attorney or within a reasonable time thereafter.

    Unless otherwise provided by Rule 13(a), your answer must state as a counterclaim any claim which you may have against the plaintiff which arises out of the transaction or occurrence that is the subject matter of the plaintiff's claim or you will thereafter be barred from making such claim in any other action.

    Witness, ~~Suzanne V. DelVecchio~~ Barbara J. Rouse, Esquire, at Boston, the _____28th_____ day of _____February_____, in the year of our Lord two thousand _six_.

*Michael Joseph Donovan*

Clerk/Magistrate

NOTICE TO DEFENDANT — You need not appear personally in court to answer the complaint, but if you claim to have a defense, either you or your attorney must serve a copy of your written answer within 20 days as specified herein and also file the original in the Clerk's Office.

NOTES.
1. This summons is issued pursuant to Rule 4 of the Massachusetts Rules of Civil Procedure.
2. When more than one defendant is involved, the names of all defendants should appear in the caption. If a separate summons is used for each defendant, each should be addressed to the particular defendant.
3. TO PLAINTIFF'S ATTORNEY: PLEASE CIRCLE TYPE OF ACTION INVOLVED

    (1) TORT — (2) MOTOR VEHICLE TORT — (3) CONTRACT — (4) EQUITABLE RELIEF — (5) OTHER

FORM CIV.P. 1 3rd Rev.

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.

SUPERIOR COURT DEPARTMENT
OF THE TRIAL COURT
BUSINESS LITIGATION SESSION

HERBERT A. SARKISIAN, JR.,
Individually and Derivatively on Behalf of
MOORS & CABOT, INC.,
                              Plaintiff,

v.

ROBERT W. MOREY,
                              Defendant.

06-0887

Civil Action No. 06-_____ BLS

3/1/06 Filed & Allowed,
By the Court, van pestl, J.
Gregoria a. Antoca

## MOTION FOR APPOINTMENT OF SPECIAL PROCESS SERVER

Pursuant to Rule 4(c) of the Massachusetts Rules of Civil Procedure, Plaintiff hereby moves that

this Court appoint Beacon Hill Research, Inc. and its agents, 6 Beacon Street, Suite 825, Boston, MA,

02108, as qualified process server to serve process, orders of notice, any writs of attachment, executions

or other papers in this matter.  As grounds for this Motion, the Plaintiff states that the special process

server is eighteen years of age or over, has no interests in this action and that allowance of this Motion

will assist in expediting this action.

Respectfully submitted,
HERBERT A. SARKISIAN, JR., Individually
and Derivatively on Behalf of
MOORS & CABOT, INC.

By their attorneys,


R. Robert Popeo, BBO # 403360
Michael S. Gardener, BBO # 185040
Meredith M. Leary, BBO # 654211
Mintz, Levin, Cohn, Ferris
     Glovsky and Popeo, P.C.
One Financial Center
Boston, Massachusetts 02111
(617) 542-6000

Dated:  February 28, 2006

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of this document will be served upon the defendant when service of process is made.

Meredith M. Leary

| CIVIL ACTION<br>COVER SHEET | DOCKET NO(S)<br>B.L.S. | Trial Court Of Massachusetts<br>Superior Court Department<br>County: SUFFOLK |
|---|---|---|

| PLAINTIFF(S)<br>HERBERT A. SARKISIAN, JR.,<br>Individually and Derivatively on Behalf of<br>MOORS & CABOT, INC. | DEFENDANT(S)<br>ROBERT W. MOREY |
|---|---|

ATTORNEY, FIRM NAME, ADDRESS AND TELEPHONE
Michael S. Gardener, Esquire
Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.
One Financial Center, Boston, MA 02111, (617) 542-6000
BBO # 185040

**RECEIVED**
**MAR 01 2006**

SUPERIOR COURT - CIVIL
MICHAEL JOSEPH DONOVAN
CLERK / MAGISTRATE

Origin Code
Original Complaint

TYPE OF ACTION AND TRACK DESIGNATION (See reverse side)

| CODE NO.<br>BF.1 | TYPE OF ACTION (specify)<br>Breach of Fiduciary Duty | TRACK<br>(B) | IS THIS A JURY CASE?<br>(X) Yes    ( ) No |
|---|---|---|---|

The following is a full and detailed statement of the facts on which plaintiff relies to determine eligibility in to
The Business Litigation Session.

This action arises out of the repeated breaches of fiduciary duty, self-interested conduct,
breach of contract and fraud committed by defendant Robert W. Morey against plaintiffs
Herbert A. Sarkisian, Jr. ("Sarkisian") and Moors & Cabot, Inc. in connection with the
operation of that closely held company. Defendant, the majority shareholder in this two-
shareholder company, engaged in a purposeful scheme to squeeze out Sarkisian, the
minority shareholder, to unjustly seize virtually the full value of the Company for grossly
inadequate consideration, and to deprive Sarkisian of almost all the benefit of his monetary
and twenty-seven year sweat equity investment in one of the oldest and most respected
securities firms in Boston. Defendant has repeatedly breached his fiduciary duties by,
among other things: (i) causing the Company to operate in an undercapitalized condition
close to violation of regulatory requirements; (ii) compelling the Company to obtain
working capital by issuing shares of stock to defendant at a price below their true fair
market value; (iii) preventing an objective, independent valuation of such shares to be
performed; (iv) not permitting the Company to go into the market to seek equity or debt
financing from independent third parties at more favorable terms than those being offered
by defendant; and (v) refusing to permit key employees to acquire equity interests in the
Company; (vi) systematically and in bad faith squeezing out Sarkisian by causing his
ownership interest in the Company to be diluted; (vii) causing key employees to leave the
employ of the Company; and (viii) depriving Sarkisian of his seat on the Board of
Directors and his position as Chief Executive Officer.

* A Special Tracking Order shall be created by the Presiding Justice of the Business Litigation
Session at the Rule 16 Conference.

PLEASE IDENTIFY, BY CASE NUMBER, NAME AND COUNTY, ANY RELATED ACTION PENDING IN
THE SUPERIOR COURT DEPARTMENT.

"I hereby certify that I have complied with the requirements of Rule 5 of the Supreme Judicial Court Uniform Rules on
Dispute Resolution (SJC Rule 1:18) requiring that I provide my clients with information about court-connected dispute
resolution services and discuss with them the advantages and disadvantages of the various methods."

Signature of Attorney of Record                                          DATE: 2/23/06

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, SS.

SUPERIOR COURT
DEPARTMENT OF THE
TRIAL COURT

HERBERT A. SARKISIAN, JR.,
Individually and Derivatively on Behalf of
MOORS & CABOT, INC.,

        Plaintiffs,

v.

ROBERT W. MOREY,

        Defendant

)
)
)
)
)
)
)
)
)
)
)
)
)
)

RECEIVED

MAR 01 2006

SUPERIOR COURT - CIVIL
MICHAEL JOSEPH DONOVAN
CLERK / MAGISTRATE

CIVIL ACTION NO.

JURY TRIAL DEMANDED

## VERIFIED COMPLAINT

## INTRODUCTION

1.     This action arises out of the repeated breaches of fiduciary duty, self-interested conduct, breach of contract and fraud committed by defendant Robert W. Morey against plaintiffs Herbert A. Sarkisian, Jr. ("Sarkisian") and Moors & Cabot, Inc. in connection with the operation of that closely held company. Defendant, the majority shareholder in this two-shareholder company, engaged in a purposeful scheme to squeeze out Sarkisian, the minority shareholder, to unjustly seize virtually the full value of the Company for grossly inadequate consideration, and to deprive Sarkisian of almost all the benefit of his monetary and twenty-seven year sweat equity investment in one of the oldest and most respected securities firms in Boston.

## PARTIES

2.     Plaintiff Herbert A. Sarkisian, Jr. is a resident of Plymouth, Massachusetts. Sarkisian, through a holding company owned exclusively by him, is a minority shareholder of Moors & Cabot, Inc. ("Moors & Cabot" or "Company"), and until he was squeezed out of those positions on January 27, 2006, he was the Chief Executive Officer and Chairman of the Board of Directors of the Company.

3.     Moors & Cabot is a Massachusetts corporation and a broker and dealer in securities having its principal place of business at 111 Devonshire Street in Boston, Suffolk County, Massachusetts. Moors & Cabot is named as a necessary or indispensable party.

4.     Defendant Robert W. Morey is a resident of California and is the majority shareholder of Moors & Cabot.

## JURISDICTION AND VENUE

5.     This Court has jurisdiction over this matter pursuant to G.L. c. 212, § 4, as it involves disputes concerning a Massachusetts corporation. This Court also has jurisdiction pursuant to G.L. c. 214, § 1 as plaintiffs seek equitable relief. This Court has jurisdiction over defendant pursuant to G.L. c. 223A, § 3.

6.     Venue in this Court is proper pursuant to G.L. c. 223, § 8, as Moors & Cabot is a Massachusetts corporation with its principal place of business in Suffolk County. Venue is appropriate in the Business Litigation Session by operation of Administrative Directive No. 03-1.

2

## FACTS

7.      Moors & Cabot is a securities firm that has been in business in Boston for approximately 120 years. By 1989, Sarkisian, who by that time had almost twenty-five years of experience in the securities industry and had been employed by the firm for ten years, had acquired all of the shares of the Company. At that time Moors & Cabot had approximately thirty employees with $3 million in revenues.

8.      In 1989 Sarkisian met defendant and entered into an agreement with him. Sarkisian would devote his time, skill and experience toward running the Company as CEO, President and Chairman of the Board of Directors. Defendant, who had been very successful in the insurance business but who had, and has, only meager experience in the securities industry, would acquire from Sarkisian a 51 percent ownership interest in Moors & Cabot and would advance funding for the company's future operations, on a subordinated debt basis, as the need arose from time to time.

9.      For the next sixteen years, as Sarkisian continuously labored to operate and grow the Company, this arrangement was honored by defendant. From 1989 until 2001, while he was working assiduously to grow the business of Moors & Cabot, Sarkisian took no salary for his enormous efforts. Defendant advanced funds for the operations of Moors & Cabot on a subordinated debt basis as such funds were required. During this period defendant advanced approximately $3.45 million to the Company on a subordinated debt basis; Sarkisian himself, in addition to his enormous "sweat equity," also loaned $.85 million. Consistent with the parties' agreement, these contributions caused no change in the shareholders' respective 51/49 ownership interests in Moors & Cabot. At the same time, as a result of Sarkisian's efforts, Moors & Cabot grew from

3

30 employees to 200, while annual revenues grew from $3 million to $60 million and the net worth and market value increased commensurately.

10.    At all times Sarkisian treated defendant like a partner even in matters only tangentially related to Moors & Cabot. Thus, when Sarkisian was presented personally with the opportunity to acquire 111 Devonshire Street in Boston, the building where Moors & Cabot is a tenant, and despite having no obligation to do so, Sarkisian offered defendant the right to participate on a 50/50 basis in the acquisition. Defendant availed himself of that opportunity, and when the parties subsequently resold the building just a few years later, defendant earned a profit of approximately $2.5 million from the sale.

11.    Commencing in 2005, in violation of his fiduciary duties to Moors & Cabot and to Sarkisian, defendant abused his majority position and undertook a stratagem to (i) squeeze Sarkisian out of the Company; (ii) dilute the value of Sarkisian's ownership interest from 49 percent to ever decreasing amounts; and (iii) deprive Moors & Cabot of the fair value of its assets by causing the Company to issue shares to him for far less than fair and adequate consideration.

12.    Prior to that time, in 2001, defendant had demanded that Sarkisian give up the position of president of Moors & Cabot to an individual favored by defendant, and "stay out of his way." Thereafter, as the Company sustained losses from moving into business lines that Sarkisian had repeatedly warned were very difficult and likely not to be profitable, Sarkisian urged that Moors & Cabot rebalance its business toward areas more profitable for the Company. Defendant disregarded Sarkisian's concerns and advice. Defendant also ordered that his son, who had only limited securities experience and no position in the Company, be permitted to attend all management meetings.

4

13.     Immersing himself further in the day-to-day affairs of the Company, defendant attempted to remove the Chief Financial Officer of Moors & Cabot, who was working to overhaul the firm's antiquated accounting system. Sarkisian was initially able to persuade defendant not to take such action. However, throughout 2004 and into 2005, as the Company incurred further losses, the Chief Financial Officer expressed his deepening concern over the mounting losses and the need to report those losses accurately and timely. Further, in the space of six months, the Chief Financial Officer required the Company to file five separate notices with the Securities and Exchange Commission and the New York Stock Exchange, both of whom regulate the Company's business activities, regarding certain financial violations. Over Sarkisian's objection, defendant ordered the Chief Financial Officer to be terminated.

14.     In February 2005 Sarkisian was advised that the Company needed cash to cover certain expenses. Sarkisian agreed to loan $150,000 as subordinated debt to cover these expenses. After providing that cash amount, which was then used by the Company, Sarkisian was informed that contrary to their agreement -- and for the first time in sixteen years -- defendant had also provided the Company with $156,000, but in the form of equity for which he would receive additional shares of Moors & Cabot. Sarkisian was further informed that his own $150,000 loan was being recategorized -- retroactively, at defendant's insistence and over Sarkisian's objection -- as equity and not debt.

15.     In April, 2005 the Company required additional operating funds. At that time, Moors & Cabot had 208 shares outstanding, with defendant owning 106 shares (51 percent) and Sarkisian owning 102 shares (49 percent).

5

16.   Defendant again refused to provide such funding by means of subordinated debt -- which had been both the agreement between, and the practice of the parties since 1989 -- or other non-dilutive equity.  Instead, defendant demanded that the Company issue to him additional voting shares in the Company, the effect of which would be to dilute Sarkisian's ownership share.

17.   Sarkisian again protested this unilateral change by defendant in the parties' understanding and their sixteen-year course of dealing.  Sarkisian further advised defendant that even if he insisted on taking additional equity instead of providing subordinated debt, this could be accomplished by means of preferred stock or other non-dilutive equity, so that Sarkisian's interest in the Company would not be diluted.  Defendant refused to consider these means of satisfying the Company's need for further funding while providing him with equity that would not dilute Sarkisian's voting interest in Moors & Cabot.  Nor did defendant comply with his fiduciary obligations and permit the Company to go to the marketplace to obtain loans or equity financing on terms far more advantageous to the Company and to Sarkisian than would result from defendant issuing additional shares to himself.

18.   Sarkisian objected to defendant's unilateral breach of their longstanding agreement and violation of his fiduciary duty to Sarkisian and the Company.  Sarkisian did not want to be forced into a position of having to continually make additional equity contributions to a company that he could never control, since defendant would always own 51 percent of the voting shares.  This was especially the case in light of defendant's actions in ignoring his advice and causing the Company to remain overcommitted to unprofitable lines of business, in discharging corporate officers over Sarkisian's

6

objection, and in preventing the Company from obtaining more favorable equity

financing from independent, outside sources. In a word, Sarkisian did not want to

continually have to make large equity contributions merely to maintain his 49 percent

minority position in a company that defendant would control solely for his own personal

benefit. As defendant also well knew, Sarkisian did not have the financial resources to

match defendant's purchases merely to maintain a minority 49 percent interest in the

Company. If defendant had not been prepared to maintain a 51/49 split and to provide

funding by means of subordinated debt or some other non-dilutive equitable basis, as had

been their agreement and their uninterrupted practice for sixteen years, Sarkisian never

would have offered defendant the 51 percent ownership position in 1989.

      19.    On April 29, 2005, defendant caused the Company to issue to him twenty-

four additional shares, bringing his total number of shares to 130, as compared to

Sarkisian's 102, thereby diluting Sarkisian down to a 44 percent interest. Defendant paid

the Company $20,833 for each of the twenty-four shares.

      20.    Following this step towards diluting Sarkisian's interest in the Company,

defendant then attempted to seize for himself perhaps the most significant asset of

Moors & Cabot, its ownership interest in the Boston Stock Exchange ("BSE").

Defendant advised Sarkisian that he would advance additional funds for the operation of

the Company in return for preferred stock, but that stock would have to be tied to the

BSE interests, such that in the event of a sale of the Company, defendant would obtain

for himself sole control of the valuable BSE interests. Of course, as the majority

shareholder of Moors & Cabot, defendant could effectively cause a sale at his sole

discretion, thereby giving him complete control over the BSE assets. Sarkisian expressed

his strong objection to defendant's proposed arrangement to seize for himself the largest

single asset of the Company which arrangement, upon information and belief, would

have been contrary to the requirements of applicable securities laws.

21.     Angered by Sarkisian's unwillingness to capitulate to this unconscionable

effort to seize Company assets for himself, defendant promptly set out to continue with

his stratagem for squeezing out Sarkisian while acquiring greater ownership interests in

the Company for unfair and inadequate consideration.  Defendant again informed

Sarkisian that he would only provide additional needed funding in return for an increase

in his equity position.  On May 17, 2005, plaintiff caused the Company to issue to him

148 additional shares, bringing his total number of shares to 478, thereby further diluting

Sarkisian's position down to 17.5 percent.  Further, this time defendant only paid the

Company $4,598 per share.  Thus, in less than three weeks defendant more than trebled

his interest in Moors & Cabot, while at the same time reducing the purchase price of the

stock he was acquiring by 75 percent.  Defendant refused to have a valuation performed

by an independent third-party to determine the true fair market value that should be paid

for the shares.  Defendant refused to explain how the per share value of the Company

could possibly have gone from $20,833 on April 29, 2005 to only $4,598 on May 17,

2005.  Defendant refused to permit the Company to go to the marketplace to obtain

equity financing or loans from independent third parties on terms that would be more

favorable to the Company and to Sarkisian.

22.     Sarkisian had no choice but to acquiesce in the April 29 and May 17

transactions.  Defendant refused to advance funds as subordinated debt, nor would he

permit the Company to go into the marketplace to obtain equity or debt financing from

8

independent third parties on terms more favorable than defendant was prepared to set for his own personal benefit. As a result, throughout 2005 defendant kept the Company on an impossibly short leash in terms of working capital, skating barely above (and sometimes falling below) the minimum net capital requirements established by the SEC and the New York Stock Exchange, and unable to go to the marketplace to obtain adequate amounts of capital on more favorable terms. Thus, Sarkisian had no choice but to acquiesce in defendant's squeeze out scheme or else have the Company fall into non-compliance with its regulators and adversely impact the firm's reputation and credibility within the industry and its own employees.

23.     Under the terms of one of the subordinated debt loans made by Sarkisian to the Company in the amount of $200,000, Sarkisian had the right to have that loan paid, with interest, on July 31, 2005. In July of 2005 defendant told Sarkisian that if he agreed to roll over that subordinated debt to 2008, defendant would advance future funds to the Company without further diluting Sarkisian's interest in the Company, and Sarkisian would be permitted to receive the current compensation and benefits being paid to him as CEO and Chairman of the Board at least until such time as all of his outstanding subordinated debt was redeemed or replaced. In reliance on this representation, and confirming the terms of this agreement by letter dated July 28, 2005, Sarkisian did not demand payment of the loan on July 31, 2005 and instead rolled the debt over. In addition, as to the remaining $650,000 of his subordinated debt loans, in reliance on defendant's representations, Sarkisian agreed to refrain from sending the requisite notice that would have allowed him to obtain repayment of those loans from the Company within thirteen months. This was of substantial benefit to defendant and the Company,

9

and significantly detrimental to Sarkisian, who in April 2005 had agreed to waive further interest payments on such loans.

24.    Only after the time had passed for Sarkisian to obtain payment of the subordinated debt loan did defendant inform Sarkisian that he would not honor their agreement as confirmed by Sarkisian's letter of July 28, 2005.

25.    To the contrary, on October 27, 2005, defendant informed Sarkisian that he would only advance further funds needed by the Company to remain in conformity with minimum net capital requirements upon the issuance to him of an additional 35.43 shares, for which he would only pay $5,645.16 per share. Again, defendant refused to obtain an independent valuation of the shares of the Company, nor would he permit the Company to go to the marketplace to obtain equity or debt financing on more favorable terms than defendant was proposing. Again, Sarkisian had no choice but to acquiesce in this demand, as otherwise the Company would fall into non-compliance with the regulatory requirements of the SEC and the NYSE. As a result, Sarkisian's ownership interest was further diluted to 16.5 percent.

26.    In December, 2005 defendant proposed yet again to further dilute Sarkisian's interest in the Company by conditioning any further infusion of funds upon the issuance of an additional 89 shares to him, which would reduce Sarkisian's interest down to 14.4 percent. Defendant again refused to have any independent third-party valuation performed, again refused to permit the Company to seek equity or debt financing from independent third parties on more favorable terms, and again demanded that the shares be sold to him at the unfair and inadequate price of $5,645.16 per share. Sarkisian refused to acquiesce any further in defendant's stratagem to squeeze him out.

10

27.    Defendant promptly made Sarkisian pay the price for his unwillingness to surrender to defendant's scheme. On January 20, 2006, after causing one prior defective notice of a shareholders' meeting to be sent, defendant caused a shareholders' meeting to be called for January 27, 2006. On that day, lacking the courage to take the action personally, and instead acting through a proxy, defendant as majority shareholder removed Sarkisian both from the Board of Directors and from his position as Chief Executive Officer of Moors & Cabot, his place of employment for twenty-seven years, depriving him of any salary or benefits. Defendant proceeded to put his own son on the Board. To cover up his improper acts, defendant then caused an announcement to be issued falsely implying that Sarkisian had voluntarily given up his positions.

28.    On February 24, 2006, defendant acted to further breach his agreement with Sarkisian and dilute the ownership interest of Sarkisian by causing the Company to issue to him an additional 53.14 shares for which he only paid inadequate consideration of $5,645.16 per share. Defendant took this action without any advance notice whatsoever to Sarkisian. Again, defendant failed to obtain an independent valuation of the shares of the Company, nor would he permit the Company to go to the marketplace to obtain equity or debt financing on more favorable terms.

29.    While requesting that defendant honor the terms of his agreements and meet his fiduciary obligations both to Moors & Cabot and to him, Sarkisian at all times attempted to deal openly and fairly with defendant. Thus, Sarkisian has informed defendant that he would be prepared to sell his shares to defendant or arrange to buy defendant's shares, at a valuation to be determined by an independent appraiser. Sarkisian has further advised defendant that he is prepared to have defendant determine a

11

value for the stock of Moors & Cabot, following which Sarkisian would elect either to sell his shares to defendant or arrange to buy defendant's shares. Sarkisian has further advised defendant that he is prepared to have both parties submit a sealed price per share, and the Company would be sold to the party submitting the highest price. Sarkisian also advised defendant that he was prepared to suffer dilution if defendant would agree to go to the marketplace to obtain sufficient independent equity or debt financing at market terms. Sarkisian even offered to introduce potential sources of such funding to the Company. Thus, Sarkisian has attempted to do everything possible to make certain that the respective interests of the parties are preserved as they agreed while insuring that the Company obtains the necessary operating funds to conduct and grow its business, or in the alternative to make certain that each shareholder obtains the fair market value for his shares.

30.    Defendant's unremitting effort to aggregate to himself as much of the Company's equity ownership as possible for inadequate consideration has been detrimental to the best interests of Moors & Cabot and Sarkisian in other ways as well. In order for Moors & Cabot to attract and retain the most productive and profitable employees, it is important to offer those employees an equity interest in the enterprise. Sarkisian repeatedly requested that defendant agree to make equity interests in the Company available to key employees. While this might result in an immediate dilution of their respective interests, Sarkisian recognized that such a practice would be a means both of attracting additional capital as well as increasing the overall value of the Company by retention of key personnel, thereby increasing the value of all shareholders' interests. Defendant refused to agree to Sarkisian's requests. As a result of defendant's

12

intransigence, key employees both in the New York and the Chicago offices of the

Company have terminated their relationship with Moors & Cabot, resulting in great harm

to the Company and to Sarkisian.

31.     Moors & Cabot has only two shareholders. Defendant owned 51 percent

of the shares even prior to the squeeze out efforts described above. As a result of those

efforts, defendant has obtained for himself even greater control over the Company.

Sarkisian has repeatedly advised defendant that his actions as aforesaid are in breach of

his agreements and in violation of his fiduciary duties owed both to Sarkisian and to

Moors & Cabot. Because of these facts, and because the actions complained of are all

intended to advantage defendant at the expense of Sarkisian and the Company, any

further demand upon the Company to take action against defendant would be futile.

## COUNT ONE

### (Derivative Action for Breach of Fiduciary Duty)

32.     Plaintiffs repeat and reallege each and every preceding paragraph as if

fully reiterated herein.

33.     At all relevant times Sarkisian through his holding company is and has

been a shareholder of Moors & Cabot.

34.     Defendant as the majority shareholder of the Company owes a fiduciary

duty of utmost good faith and loyalty to Moors & Cabot and has an obligation to act with

independent judgment to advance the best interests of the Company.

35.     Defendant has repeatedly breached his fiduciary duties to the Company by

(i) causing the Company to operate in an undercapitalized condition close to violation of

regulatory requirements; (ii) compelling the Company to obtain working capital by

13

issuing shares of stock to defendant at a price below their true fair market value;

(iii) preventing an objective, independent valuation of such shares to be performed;

(iv) not permitting the Company to go into the market to seek equity or debt financing from independent third parties at more favorable terms than those being offered by defendant; and (v) refusing to permit key employees to acquire equity interests in the Company.

36.     Although Sarkisian has demanded that defendant cease and desist from such self-dealing, he has refused to do so and any further demand would be futile.

37.     As a result of defendant's breaches of fiduciary duty, defendant is liable to plaintiffs.

## COUNT TWO

### (Individual Action for Breach of Fiduciary Duty)

38.     Plaintiffs repeat and reallege each and every preceding paragraph as if fully restated herein.

39.     Defendant, as majority shareholder of the Company, owes Sarkisian the fiduciary duty of utmost good faith and loyalty.

40.     Defendant has repeatedly breached his fiduciary duty to Sarkisian by:

(i)     Systematically and in bad faith squeezing out Sarkisian by causing his ownership interest in the Company to be diluted by means of providing funding for the Company through the issuance of voting shares to defendant in return for inadequate consideration, when such funding could have been provided in the form of subordinated debt or the issuance of preferred or other non-dilutive equity, or through debt or equity financing provided by independent third parties on more favorable terms;

14

(ii)     Causing key employees to leave the employ of the Company; and

(iii)    Depriving Sarkisian of his seat on the Board of Directors and his position as Chief Executive Officer, thereby depriving him of any voice on the operation of his investment as well as a principal form of return on his investment of both monetary and human capital in Moors & Cabot, and the very basis for his investment in the Company.

41.    Defendant is therefore liable to Sarkisian for his breaches of fiduciary duty.

## COUNT THREE

## (Individual Action for Breach of Contract)

42.    Plaintiffs repeat and reallege each and every preceding paragraph as if fully reiterated herein.

43.    Defendant had a contract with Sarkisian that provided defendant with a 51 percent ownership interest in the company, in return for which defendant agreed that he would advance funding as needed by Moors & Cabot in a manner that would not cause Sarkisian's interest to be diminished and that would permit him to serve as an officer and director with usual compensation and benefits.

44.    While Sarkisian performed under that agreement, defendant breached the contract by abusing his position as 51 percent shareholder and causing Sarkisian's ownership interest to be grossly diluted and removing Sarkisian from his positions as Chief Executive Officer and Chairman of the Board of Directors.

45.    Defendant had a further contract with Sarkisian whereby he agreed not to cause further dilution of his interest below that which he had as of July 31, 2005, and to

15

permit Sarkisian to retain his compensation and benefits as Chief Executive Officer and
Chairman of the Board of Directors of the Company until such time as his subordinated
debt was redeemed or replaced, if Sarkisian would agree to roll over subordinated debt of
approximately $200,000 past the July 31, 2005 repayment date.

46.     Sarkisian performed under the terms of that agreement, did not require that
said subordinated debt be repaid on July 31, 2005 in accordance with its terms, and
instead rolled over the debt and refrained from sending the notice that would have
permitted him to obtain repayment within thirteen months on his remaining loans, all to
the benefit of defendant and the Company.

47.     Defendant breached said contract by thereafter causing Sarkisian to be
removed from his positions as Chairman of the Board and Chief Executive Officer and
terminating his salary and benefits, and by further diluting his ownership interest in the
Company, all to the great detriment of Sarkisian.

48.     Defendant is liable to Sarkisian for his breach of his agreements with
Sarkisian.

## COUNT FOUR

### (Individual Action for Violation of Implied Covenant of Good Faith and Fair Dealing)

49.     Plaintiffs repeat and reallege each and every preceding paragraph as if
fully reiterated herein.

50.     By his aforesaid actions, defendant breached the implied covenant of good
faith and fair dealing inherent in all contracts in the Commonwealth and is liable to
Sarkisian for such breach.

16

## COUNT FIVE

### (Individual Action for Fraud)

51.  Plaintiffs repeat and reallege each and every preceding paragraph as if fully reiterated herein.

52.  Defendant represented to Sarkisian that if Sarkisian did not call in his subordinated note for approximately $200,000 due on or about July 31, 2005, Sarkisian would not suffer any further dilution of his ownership interest in the Company and he would be permitted to retain his compensation and benefits as Chairman of the Board and Chief Executive Officer until all of his subordinated debt was redeemed or replaced. Defendant made this representation to Sarkisian for the purpose of having defendant rely thereon.

53.  Sarkisian justifiably did rely upon this representation by defendant, did not demand payment on the note and instead rolled the note over and refrained from sending notice for repayment of his other loans.

54.  At the time defendant made the representation he knew that it was false and he did not intend to honor said representation. As soon as the time passed for Sarkisian to enforce the note, defendant informed Sarkisian he would not honor the representation, and he thereafter caused Sarkisian to suffer further dilution of his ownership interest in the Company and he removed Sarkisian from the Board and from his position as Chief Executive Officer without further compensation or benefits, all to the great detriment of Sarkisian.

55.  Defendant is liable to Sarkisian for his fraudulent conduct.

17

## PRAYERS FOR RELIEF

WHEREFORE, plaintiffs respectfully request that the Court:

1.      Order defendant to restore Sarkisian to his position as Chairman of the Board of Directors and Chief Executive Offer of the Company with full restitution of salary and benefits, plus interest;

2.      Order defendant to transfer to Sarkisian sufficient shares to restore his 49 percent ownership interest in the Company;

3.      Order defendant to pay to Sarkisian all principal and interest due under the terms of the subordinated note rolled over by Sarkisian and to deem the notice for repayment of Sarkisian's remaining loans to have been sent as of July 31, 2005;

4.      Permanently enjoin defendant from diluting Sarkisian below a 49 percent interest in the Company except with the consent of Sarkisian or to bring bona fide new equity financing into the Company from disinterested third parties;

5.      Permanently enjoin defendant from causing the Company to issue shares to him at less than fair market consideration;

6.      Award Sarkisian all damages suffered by him as a result of defendant's unlawful acts;

7. .    Award plaintiffs their reasonable costs and attorney's fees; and

8.      Award such other and further relief as is just and equitable.

18

**JURY DEMAND**

Plaintiffs respectfully demand a trial by jury on all claims so triable.

Respectfully submitted,

HERBERT A. SARKISIAN, JR.,
Individually and Derivatively on Behalf of
MOORS & CABOT, INC.

By their attorneys,

R. Robert Popeo, BBO # 403360
Michael S. Gardener, BBO # 185040
Meredith M. Leary, BBO # 654211
Mintz, Levin, Cohn, Ferris, Glovsky and
    Popeo, P.C.
One Financial Center
Boston, MA 02111
(617) 542-6000

Dated: February 28, 2006

## VERIFICATION

I, Herbert A. Sarkisian, Jr., state that I have read the foregoing Verified Complaint and am familiar with its content, and to the best of my knowledge and belief, the facts alleged therein are true and accurate.

Signed under the pains and penalties of perjury this 28th day of February, 2006.

Herbert A. Sarkisian, Jr.

LIT 1561108v.1

20